Dureee, Judge,
delivered the opinion of the court:
This is a suit for damages plaintiffs claim for the alleged wrongful termination for default of their right to deliver revolvers, handcuffs and bullets under a contract with the General Services Administration.
In 1956, GSA issued an inquiry for bids to prospective suppliers for items to be used by the Civil Police Administration Program in Vietnam. Plaintiffs, doing business as Potter’s Camera Store, submitted a bid. The bid specified a delivery date 120 days after execution of the contract. On October 3,1956, Contract GS-OOP-22465-ICA was entered into by plaintiffs and defendant. Under the contract, plaintiffs were to supply defendant several items including 2,000 “Ruby Extra” Gabilondo revolvers, 100 dozen handcuffs, and 500 cases of 38 special match bullets, 2,000 per case. The delivery date specified in the contract was 60 days after the execution date of the contract. The contract stipulated that the Spanish revolvers be comparative in quality and performance to Smith & Wesson Model 38 revolvers, or plaintiffs were to supply Smith & Wessons at the same price.
Plaintiffs delivered all the items covered by the contract except the revolvers, bullets and handcuffs. On January 17, 1957, the contracting officer terminated plaintiffs’ right to proceed with delivery of the revolvers and handcuffs since plaintiffs failed to deliver on or before January 15, 1957.
On February 13, 1957, the contracting officer terminated plaintiffs’ right to proceed with delivery of the bullets since plaintiffs had failed to deliver on or before January 25,1957. *30 Plaintiffs appealed the contracting officer’s determination to the Board of Review of GSA. The Board approved the contracting officer’s actions on December 18, 1957, and its action was in turn approved by the Administrator on December 31,1957.
THE REVOLVERS
As to the revolvers, plaintiffs advance two arguments that seem to be mutually exclusive. First, plaintiffs argue that the rejection of the Gabilondo revolvers on qualitative grounds was improper since no adequate comparative testing was ever performed. Second, and alternatively, plaintiffs argue that if the rejection of the Gabilondo revolvers was correct, the lateness of the rejection mandated that plaintiffs be given reasonable time to procure and substitute Smith & Wessons.
The trial commissioner has found that no adequate comparative tests were run on the Gabilondo revolvers. PIow-ever, the record is clear that even had the Gabilondo revolvers been acceptable to defendant, plaintiffs could not have delivered on time. Well in advance of the execution of the contract, on August 22, 1956, plaintiffs were apprised by Gabilondo that “* * * we should not be able to give you a prompt delivery for the whole lot of 2,000 revolvers cal. 38 5" barrel.” Again, in September, after some communication with both Gabilondo and the United States Consul in Spain concerning delivery of sample revolvers plaintiffs were informed by the Consul that “* * * because of prior commitments for the same type of pistol, they [Gabilondo] would need a minkrmm of from eight (8) to twelve (12) months to complete your order * * [Emphasis added.] Notwithstanding this information, plaintiffs contracted with defendant on October 3 to supply 2,000 revolvers within 60 days even though they had not yet placed a firm order with Gabilondo.
On October 11, 1956, eight days after the contract was executed, plaintiffs again received a letter from Gabilondo which again stipulated that:
In regard to delivery, we are not able to supply the 2.000 revolvers in less than 8 months after the order is *31 firmly [sic] placed, and partial shipments must be allowed. [Emphasis added.]
Plaintiffs never placed a firm order with Gabilondo for the revolvers until January 6, 1957, and, as subsequent events bear out, it was not until June 21, 1957, that Gabilondo informed plaintiffs that it had “* * * ready for immediate [sic] shipment the first lot of 1,000 only “iujbx extra” revolvers * * [Emphasis added.] Had plaintiffs chosen to rely on the quality of the Gabilondo revolvers, they would still have to demonstrate their willingness, readiness and capacity to perform the contract before recovery could be had. United States v. Penn Foundry & Mfg. Co., 337 U.S. 198 (1949). See also Carnegie Steel Co. v. United States, 240 U.S. 156, 164 (1916) where the Supreme Court pointed out “* * * the very essence of the promise of a contract to deliver articles is ability to 'procure or make them.” [Emphasis added.] Not only did plaintiffs fail to prove their willingness, readiness and capacity to deliver the Gabilondo revolvers on the due date (or even within a reasonable time after the due date and after the test results were known), but there is affirmative evidence in the record which indicates that plaintiffs did not have the capacity to deliver the revolvers Since there is no showing that plaintiffs could have performed the contract, it is unnecessary for us to consider the question of comparative testing and the correctness of the contracting officer’s action in reliance on those tests.
Plaintiffs’ second argument is that the lateness of defendant’s rejection of the Gabilondo revolvers mandated a reasonable extension of time to enable substitution of the required Smith & Wessons. To place this argument in a chronological frame of reference, we again point out that the due date on this 60-day contract was December 3, 1956. The tests were begun on December 11th, and plaintiffs were notified that the Gabilondo revolvers were unacceptable on December 20. Plaintiffs’ right to proceed was terminated on January 17,1957. Defendant concedes that the contracting officer did waive the first delivery date (December 3). But defendant argues that by this waiver, the Government did not surrender its right to take delivery of the revolvers in a reasonable time. Plaintiffs’ retort that the question of *32 what constitutes a reasonable time “is generally dependent on the facts.” This is true. Consequently, we will review the pertinent facts here present to ascertain the reasonableness of the substitution time allowed plaintiffs. The contract had a 60 calendar-day duration. The parties agreed that upon rejection of the Gabilondo revolvers plaintiffs would supply Smith & Wessons. No provision for extending the due date in the event substitution became necessary was included in the contract. Both parties must have understood that under the express terms of the contract, the due date governed delivery of either the Gabilondo or the Smith & Wesson revolvers. Due to delay in testing, the Government waived the due date. Plaintiffs were informed on December 20th that the substitution of Smith & Wessons was required. In that communication, plaintiffs were reminded that:
There is an urgent need for these revolvers, and the delivery is now delinquent by approximately 15 days, you are hereby notified that your failure to deliver or, furnish evidence of shipment in accordance with the terms of the contract on or before January 15,1957, may result in termination of your right to proceed with delivery, and purchase may be made elsewhere, in which event any rights in the Government arising as a result of your default will be enforced. [Emphasis added.]
Through this communication, plaintiffs were given some 26 calendar days in which to procure substitution and to make delivery.
Plaintiffs did not attempt to use this additional time to procure Smith & Wessons. They made no effort to substitute the Smith & Wessons. They did finally place an order for, the Gabilondo revolvers, but as we pointed out above, even had plaintiffs stood on the comparative quality of the Gabilondos to the Smith & Wessons, the contract could not have been performed either on time or within a reasonable time. And before plaintiffs can argue that they were not given a reasonable time in which to make a substitution, when in fact the extended time given them was nearly half the life of the original contract, it would seem necessary that they make an affirmative showing of a bona fide attempt for substitution.
*33 Since plaintiffs were unable to supply the Gabilondo revolvers, and since no serious effort to substitute Smith & Wessons for the rejected Gabilondos was made within the extension of time, we conclude that plaintiffs cannot recover on that portion of their claim relating to the revolvers. Consequently, there is no need to discuss the last “failure to furnish delivery instructions” argument raised by plaintiffs.
THE BULLETS
The letter of inquiry for bids which was sent to plaintiffs as well as other potential bidders on July 10, 1956 provided that the materials could be furnished from most foreign countries. However, the letter stipulated that the point of origin be stated in the bid quotation. The letter also contained terms of delivery as follows:
(a) Products manufactured in and shipped from TUSA.
ifc s|s ‡ ‡
(2) FAS Vessel U.S. port of exit (bidder to state port or give Government Option of ports named).
(b) Products manufactured in and shipped from source countries other than U.S.A.
(1) F.O.B. vessel at port of exit (bidder to state port).
Though plaintiffs did specify that shipment of some items would originate in foreign countries, nothing was said about Item 15, the bullets.
The contract, as ultimately executed, provided for foreign inspection points for some specified items (the revolvers, typewriters and cameras) but not for the bullets. The inspection point for all other items was to be the “Contractor’s Plant, New York, N.Y.”
As to delivery, no provision was made in the contract for foreign delivery points on any items other than the revolvers, typewriters, cameras and some optical supplies. The delivery point for all other items of the contract was specified as “FAS Vessel, Port of Shipment, New York — All American Items.”
Though the contract was not executed until October 3, 1956, plaintiffs made no inquiries of ammunition manufac *34 turers until October. During that month, two American manufacturers were approached. It was then that plaintiffs became aware that the specified bullets had been discontinued as a stock item by American producers and were not available for déli/oery from existing inventories.
The one manufacturer who indicated a willingness to manufacture the bullets specified a long delivery date. Thereupon, on October 22 plaintiffs asked GSA to consider the acceptability of an alternate type bullet, but the contracting officer on October 29 rejected the request and advised plaintiffs that the specified bullét was required.
Meanwhile, a foreign manufacturer, Leon Beaux & Co. of Milano, Italy, which had also been queried in October, ■replied on October. 22 that the bullets could be supplied at a tentative price of $34.51 per thousand with an anticipated delivery date of four months. Plaintiffs requested “your very lowest price * * * FOB Geneva.” Plaintiffs also supplied four sample bullets. On November 22, Leon Beaux quoted an FOB price of $38 per thousand. The contract delivery date, December 3, expired with nothing further being done by plaintiffs, and without any action being taken by the contracting officer.
At a January 2, 1957, meeting, the contracting officer informed Gotterson, plaintiffs’ agent, that delivery of the three items here in dispute was delinquent, and that GSA expected delivery of all three items “immediately, or within a reasonable length of time? Gotterson was also told that GSA expected delivery of the handcuffs and bullets in New York. On January 8, plaintiffs again requested the contracting officer to change the bullet specifications. This second request for, a change was later rejected as we shall see.
Plaintiffs, on January 10, more than one month after the expiration of the contract delivery date (though a “reasonable time” extension was granted on January 2), placed an order with Leon Beaux for the bullets at a $38 per thousand price, FOB Geneva, Italy. Plaintiffs requested delivery by June 1,1957, or sooner,, stating that GSA inspection would be made at the Leon Beaux factory. On that same day, they wrote the GSA Field Office in London (copy to “Inspection Division, GSA, New York City”) as follows:
*35 According to the instructions given to us by Mr. O. W. Teckemeyer, Director, Inspection Division, GSA, you are hereby notified that item: No Code #2 (bullets, etc.) are to be inspected at the location shown below:
Leon Beaux & Co. (S.P.A.)
Via Dante 14 Milano, Italy
For your information, please be advised that this transaction has been made known to our, Embassy in Italy and to the Italian Government.
Contract terms are FOB vessel Port of exit, Genoa, Italy. By the words, “instructions given to us by Mr. O. W. Tecke-meyer,” plaintiffs referred to the second paragraph of an October 17th letter which read:
If material is not to be made available for inspection at your above address or at a point stated in your contract, please provide the Chief, Inspection Division, named above, with the necessary information so that the responsibility for inspection may be transferred. Notice to inspect should be in writing and ten days in advance of the desired inspection date so that inspection schedules may be prepared.
Plaintiffs’ interpretation of this paragraph was that authority to unilaterally change inspection points simply by a written notice to the appropriate Inspection Division ten days in advance of the desired inspection date had been thereby conferred upon them. Plaintiffs apparently further interpreted this paragraph as not requiring them to inform the contracting officer that they had seen fit to alter the contract. When the contracting officer communicated his understanding that the contract required inspection at plaintiffs’ plant in New York City, he was informed that, though the contract did so provide, Teckemeyer’s “* * * instructions have been followed * * *” and if the contracting officer could not for any reason “* * * permit inspection in Italy, we should have been advised some time ago.”
Though the language of Teckemeyer’s October 17th letter may be open to such an interpretation when read alone, a more reasonable interpretation of the letter when read in conjunction with the contract, would be that Teckemeyer, on behalf of the Inspection Division, GSA, was expressing that division’s willingness to cooperate with plaintiffs if the *36 contract were changed by proper authorities. But even if the letter of October 17th. could be interpreted as authorizing plaintiffs to make changes in the inspection points, there is nothing to indicate that Teckemeyer had authority to make any such authorization. And no unauthorized officer of the Government can waive the terms of the contract. Hawkins v. United States, 96 U.S. 689, 695 (1877); Balt. & Ohio R. R. v. United States, 261 U.S. 592, 596 (1923); Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384 (1947); Byrne Organization, Inc. v. United States, 152 Ct. Cl. 578, 586, 287 F. 2d 582, 586 (1961).
But we need not delve further into this question since plaintiffs here, as in the case of the revolvers, were again in no position to deliver the bullets at the time the contract expired, “immediately or within a reasonable length of time” from the January 2 meeting, or even within a reasonable time from the February 13th date when the contracting officer terminated plaintiffs’ right to proceed with delivery. Penn Mfg. Co. supra; Carnegie Steel Co., supra.
THE HANDCUFFS
The contract description of the last item in question, the handcuffs, read as follows:
Handcuffs, equal to Peerless, same as used by New York City Police Dept. Self-locking, approx. 10 oz. nickle finish.
As in the case of the bullets, the contract contains no specific provision referring to the place of inspection for the handcuffs by name. However, unlike the case of the bullets, GSA was aware from the time of plaintiff’s amendment to their bid dated July 25,1956, that plaintiffs intended to furnish handcuffs originating in a foreign country, and that the price quotation was FOB Vessel, port of exit of the foreign country named. However, plaintiffs did not name the foreign country from which the handcuffs would originate, and the contract as executed made no reference thereto.
Negotiations for the purchase of handcuffs from B. Eche-verria, S. A. Eibar, Spain were begun. An order was cabled on November 29, and confirmed by letter dated De *37 cember 7, 1956. Tbe letter of confirmation specified delivery FOB Bilbao, Spain, and provided for inspection by the London GS A Field Office as in the case of the bullets. Meanwhile, on November 17, plaintiffs wrote to the contracting officer certifying the quality of the “Star” handcuffs produced by Echeverría. A sample of the handcuffs was also sent. On December 6,1956 the contracting officer wrote plaintiffs as follows:
The preproduction sample of handcuffs which you proposed to furnish under Code 680, Item 2, Contract GS-OOP-22465-ICA have been thoroughly examined and tested as to quality and acceptability under the provision of the contract, that is, “equal to Peerless.” Enclosed as Exhibit A is an extract showing the results of the test conducted. It can be readily seen from the test results the sample handcuffs furnished for test purposes does not meet the requirements of the contract and is, therefore, not acceptable.
As you are aware, deliveries of items covered by the contract are to be made within 60 calendar days after date of execution, which is December 3, 1956. Further the contract indicates that the handcuffs are to be inspected at your plant in New York City. Inasmuch as we have not as yet received notice handcuffs are available for inspection at your New York plant, it is requested that acceptable items be made available without further delay. [See Finding 39.]
We need not, however, consider the comparative quality of the “Star” to the “Peerless” handcuffs since defendant throughout the proceedings has taken the position that the contract was terminated not by reason of quality, but solely for failure of plaintiffs to make delivery. Cf. finding 39 and footnote 17.
After some further correspondence between plaintiffs and the contracting officer pertaining to the quality of the handcuffs, the contracting officer wrote on December 20, 1956, that:
The time of delivery including any extension thereof, on the above cited contract expired December 3, 1956. the records in this office indicate that neither the merchandise or evidence of shipment has been received on Item 2, Code 680, handcuffs. Since there is an urgent need for this item, you are hereby notified that your *38 failure to deliver or to furnish evidence of shipment on or before January 15,1957 may result in termination of your right to proceed with the delivery, and purchase may be made elsewhere, in which event any rights in the Government arising as a result of your default will be enforced. '[See Finding 40.]
On January 17, 1957, by special delivery letter, the contracting officer informed plaintiffs that inasmuch as no delivery had been made or offered, plaintiffs’ right to proceed was terminated. [See Finding 41.] Up to that time, plaintiffs had never informed the contracting officer that delivery could be made. Indeed, it was not until March 30 that plaintiffs informed the contracting officer that the handcuffs were ready for inspection and delivery in Spain. This fact makes it unnecessary for us to consider the same inspection point argument as was raised in regard to the bullets. Here, as in the cases of both the revolvers and the bullets, plaintiffs have failed to show an ability to perform the contract by the dates specified or even within a reasonable time. Consequently, plaintiffs cannot recover. Penn Mfg. Co. supra; Carnegie Steel Co. supra.
Defendant, in its brief and argument, takes the position that although both sides introduced de novo evidence before our commissioner, our review of the case must be confined to the administrative record. It urges that we reverse our ruling in Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 861 (1963), where we held that defendant had waived its right to preclude consideration of de novo evidence since it had failed to make timely objection. Defendant further argues that in any event, objection to such de novo evidence made in the briefing stage of the case is timely.
While it is unnecessary to consider this position of defendant in any great depth due to our disposition of this case, we might point out that in order to be timely, an objection to admission of evidence must be made prior to, or at the time, the evidence is offered. And we have previously indicated our adherence to the views set forth in Stem, supra. Cf. WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 323 F. 2d 874 (1963); Wingate Constr. Co. v. United States, 164 Ct. Cl. 131 (1964).
*39 Accordingly, and upon the commissioner’s findings of fact which are hereby adopted as the findings of the court, plaintiffs’ claims are denied, and the petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, the briefs and argument of counsel, makes findings of fact as follows:
I. GENERAL INTRODUCTORY MATTERS
■1. The plaintiffs herein are Abraham M. Potter, Maxwell Potter, and Harold Potter, a copartnership, doing business as “Potter’s Camera Store” with principal place of business at 708 Flatbush Avenue, Brooklyn, New York. During the time involved herein, their primary business was the sale at retail and at wholesale of optical goods, cameras, and photographic supplies. These sales were made to the public generally, to the United States Government, and to state and local governments.
2. The partner most closely connected with the matters here involved was Abraham M. Potter. For convenience he will be referred to below simply as Potter. At the trial he was plaintiffs’ major witness, and he testified not only as to the facts of the case but also with respect to the material contained in certain technical reports (hereinafter fully described) regarding the supply items in dispute. While Potter possessed no previous expert knowledge with respect to the specific items here involved, he had a degree in chemical engineering from Massachusetts Institute of Technology, plus four years of graduate work at the Polytechnic Institute in Brooklyn, and served as a member of the faculty of the latter institution. He was therefore permitted to express expert opinion as to the quality and objectivity of the aforesaid technical reports. In this respect, both parties also presented the testimony of other expert witnesses which will be referred to hereinafter.
H. CONTRACTUAL ARRANGEMENTS BETWEEN THE PARTIES
A. Bid Invitation, Negotiations, and Award
3. On June 28, 1956, the International Cooperation Ad *40 ministration (ICA) issued to tlie General Services Administration (GSA) a requisition authorizing the purchase of a number of supply items for the use of the Civil Police Administration Program in Vietnam. Among the items listed in the requisition were the following:

Code Item Description

680_ 2 100 doz. handcuffs 10 oz. tempered steel, full bow, flip on action, 19 lock stops, for instant adjustment to wrist. Double swiveled links, 1200 pull test, nickel finish. Peerless or equal.
No code_ 1 2,000 each revolver, Colt Official Police .38 special. 5" barrel. Blue steel.
No code_ 2 500 eases bullet, lead 158 gr., .38 special match. 2,000 per ease.
On July 10, 1956, GSA issued to a number of prospective suppliers, including plaintiffs, a letter of inquiry for bids on 20 of the items listed in the purchase requisition, including the above-described three items, on which prospective bidders were asked to quote not later than July 26, 1956. The commodities to be furnished could be supplied from any country in the world except certain nations specified therein and generally known as the “Iron Curtain” countries. All bids were to be subject to the Government standard forms covering supply contract general provisions, invitation for bids, and special program bidding terms, copies of which forms were available to the bidders. Attached to the inquiry was the standard form of contingent fee representation to be executed by the bidder in the event the bid exceeded $1,000.
4. On July 25, 1956, plaintiffs submitted a bid for all of the 20 items included in the letter of inquiry in the total amount of $181,565.45, less a special discount in the amount of $7,565 for the award of all 20 items. The net bid price was $180,000. The bid submitted by plaintiffs provided as follows insofar as the handcuffs, revolvers, and bullets were concerned:

Total Item Number Quantity Description Unit price price

1 680-2_ 100 doz_ Handcuffs, equal to $45. 00 $4, 500 “Peerless” same as used and recommended by New York City Police Dept.

*41
Item Number Quantity Description Total Unit price price

14 no code #1. 2,000_ revolver, equal to Colt Official Police .38 special as specified “ELGOIBAR” (SPAIN). $33. 00 $66, 000
Í5 no code #2. 500 cases_ bullet, lead, etc. as specified 2,000 per ease. 95. 26 47, 630
In a letter accompanying their bid, plaintiffs stipulated that the bid was subject to several conditions, of which conditions the following are pertinent:
1. Area of sources: as specified (Spain, Japan, Switzerland, U.S.A.).
2. Point of origin of shipment — 708 Flatbush Avenue, Brooklyn, New York.
3. Terms of delivery: F.A.S. Vessel Port of NY (complete shipment).
4. Delivery period: 120 days after execution of contract.
❖ * # * ❖
8. Point of inspection: 708 Flatbush Avenue, Brooklyn, N.Y.
11. Exact prices and specifications are attached. Please note special discount to be applied for award of all items requested in bid invitation.
12. Variations in bid specifications are subject to negotiation at government option.
Plaintiffs also executed and forwarded with their bid the standard form of contingent fee representation stating that they had not employed or retained any person other than a full-time bona fide employee, working solely for them, to solicit or secure the contract, and that they had not paid or agreed to pay any such person any fee or commission contingent upon the award of the contract.
5.On July 25, 1956, plaintiffs amended their bid by a letter to GSA reading as follows:
Please consider this as an amendment to the attached bid quotation.
Items #1,4,11,12,13 and 14 will originate in foreign countries.
*42 Price quotation on these items will be FOB Vessel, port of exit of the foreign country named.
Because of the freight savings involved, a special 5% discount will be allowed on the total amount bid.
Therefore, the total of $187,565.45 will be reduced by 5% which is $9,378.77 making a net total of $178,186.68.
On the same day by a separate letter to GSA, plaintiffs furnished additional descriptive material which they felt “should be sufficient for you to evaluate and make the award on this bid proposal.” The additional descriptions read in pertinent part:
1. Handcuffs, equal to “peebless” brand, same as used and recommended by New York City Police Dept.; same as and identical to “Zephyr Police” brand, page 178 catalog of Stoeger Arms Corp. (NYC) 48 edition, 1957 will supply mac police brand.
V
3. Revolver, item #14
equal to Colt Official Police .38 Special as specified as manufactured by Gabilondo Y Compania, Elgoibar, Spain Brand name “Ruby Extra” model #XII with 5" barrel complete as described in attached catalog from Spanish factory; further reference catalog of Stoeger Arms Co. (NYC) 48th edition, 1957, page 42 “Ruby Extra Revolver”. The “Ruby Extra” Revolver is equal in specifications to the Colt Official Police (page 156 Stoeger catalog) but equal in quality to the better grade of Colt or Smith & Wesson “ribbed barrel” such as Colt Python (Stoeger page 154) or Smith & Wesson Masterpiece line “target grade” (page 150). We plan to supply this better grade revolver at no additional cost.
During August the plaintiffs wrote letters to GSA regarding their bid to which reference will be made below. Then on September 21,1956, plaintiffs wrote GSA further amending their bid quotation by increasing the 5 percent discount to 7 percent and reducing the total net bid to $174,435.57.
Shortly before September 26, 1956, defendant’s purchasing agent, L. E. Winfree, recommended the award of a contract to plaintiffs, and his recommendation was approved on September 26, 1956, by W. K. Cameron, Counsel, Tommy T. Rose, Contracting Officer, and W. W. Warburton, Branch Chief. On October 3, 1956, the recommendation was also *43 approved by L. L. Dunkle, Acting Director, National Buying Division. This action was taken by defendant’s said agents on GSA Form 1292, entitled “Recommendation and Approval of Award (s).” In pertinent part, it read as follows:
It is recommended that award (s) be made to the bidder(s) as designated and justified on the attached tabulation sheets, _ covering: Commodities for Civil Police Administration Program for Vietnam
To: Potter’s Camera Store
ICA Purchase Requisition 30-60243 was received in this office on July 2,1956, requesting GSA to procure twenty-one (21) items, cabinets, handcuffs, recorders, cameras, typewriters, revolvers, bullets, shells and gas guns.
Potter’s Camera Store quoted on the entire lot (all or none) with a special discount of 7%.
Potters Camera is the lowest bidder for all items. Accordingly, it is recommended that an award be made for all items except Item 1-Code 680,100 cabinets to Potter’s Camera Store.
sfc íJí Hí ❖ sfc
Total_$174, 435. 87 [sic]
Est. Ocean Freight_ 14,000. 00
188, 435. 87
As will be noted below, the contract executed by the parties after the award was not in exact accordance with plaintiffs’ bid, as amended, in that the contract reduced delivery time to 60 days after execution of the contract, added a provision for a comparative test of the Spanish revolvers against Smith & Wesson revolvers, and provided that if they were not equal in quality and performance to the Smith & Wesson revolvers, then plaintiffs would furnish the latter at the same price.

B. Contract QS-OOP-MtfB-IOA

6. On October 3, 1956, contract GS-00P-22465-ICA in the amount of $174,435.87 was entered into between plaintiffs and defendant. The contract was executed on behalf of the plaintiffs by A. M. Potter, as partner, and on behalf of the United States of America by Tommy T. Rose, con *44 tracting officer. The contract read, in pertinent part, as follows:
The Contractor agrees to furnish at the prices and on the terms stated herein, subject to the General Provisions (Standard Form 32,1949 Edition), which are incorporated herein by reference, and the Special Program Bidding Terms and Contract Provisions (GSA Form 1246) which are attached hereto and made a part hereof, the following:
Miscellaneous Commodities, as described on continuation sheets nos. 3 thru 5, packed for export, delivery shall be made within 60 calendar days after the date of execution of this contract by the Government, FAS Vessel, Port of Shipment, New York, N.Y., FOB Vessel, Port of Shipment, Balboa, [sic] Spain, Le Harve [sic] France and Tokyo, Japan.
The pertinent commodity descriptions contained in the contract are as follows:

Quantity Item (.number No. Supplies or services of units) Unit Unit price Amount

Code 680

2 Handcuffs, equal to Peerless, same as used by New York City Police Dept., Self-locking, approx 10 oz. nickel finish_ 100 doz $45. 00 $4, 500
* * * ‡ *

No Code

1 Revolver, “Ruby Extra”, Model XII, Caliber 38, 5” barrel, Mfg. by Gabilondo Compania of
Spain_ 2,000 each 33.00 66,000

Note:

The above described revolver will be tested for the U.S. Government by a private testing firm selected by GSA to determine if said revolver is equal in quality and performance to Smith & Wesson 38 Military and Police Model. If it is determined from said test that the above described revolver is not equal to Smith & Wesson Model 38 in quality and performance, the Contractor will furnish Smith & Wesson at the same price.
2. Bullet, lead, 158 gr., 38 special
match, 2,000 per case_ 500 case 95. 26 47, 630
With respect to inspection points, the contract provided:

Inspection Point:

Code: 780-Items 1A and IB — Paillard, Ltd., Yverdon, Switzerland
Code: 890-Items 4r-5-6 — Showa Optical Works, Tokyo, Japan
*45 No Code-Item 1 — Revolver—Gabilondo Y Compañía, Elgoibar, Spain
All other items Contractor’s Plant, New York, N.Y.
*****
EAS Vessel, Port of Shipment, New York-All American Items
FOB Vessel, Port of Shipment, Balboa, [sic] Spain-No Code-Item 1
FOB Vessel, Port of Shipment, LeHarve, [sic] France-Code 780-Items 1A & IB
FOB Vessel, Port of Shipment, Tokyo, Japan-Code 890-Items 4-5- 6
“FAS Vessel, Port of Shipment” was defined to mean delivery alongside overseas vessel free of expense to defendant; and “FOB Vessel, Port of Shipment” was defined to mean loaded in overseas vessel at port of shipment free of expense to defendant.
7. On October 4,1956, the defendant transmitted to plaintiffs a copy of the contract together with a letter which read, in part, as follows:
Unless otherwise advised by this office, inspection details will originate through the regional office of the General Services Administration nearest yonr locality. If any inspection delay should occur, please inform the General Services Administration Chief Inspector, Inspection Division, 7th and D Streets, S.W., Washington 25, D.C., immediately.
Hi $ $ $ ‡
Instructions regarding shipment, routing, all necessary documents such as invoices, packing lists, etc., and the distribution thereof will be issued only by the General Services Administration Transportation and Public Utilities Service (See Article 9 of Special Program Bidding Terms and Contract Provisions, GSA. Form 1246) and all requests for such instructions should be addressed to that office. However, shipments shall not go forward until released by a General Services Administration Inspector.
*****
On October 17,1956, O. W. Teckemeyer, Director, Inspection Division, sent a form letter to plaintiffs reading as follows:
*46 The contract referred to above has been assigned to:
FOE EXPEDITING AND INSPECTION : Balance of Items
Chief, Inspection Division
Federal Supply Service
General Services Administration
250 Hudson Street
New York 13, N.Y.
FOB INSPECTION ONLT — G0(le

180, Items la and, Id, and Item 1:

MANAGER, LONDON FIELD OFFICE
Defense Materials Service, GSA
Keysign House-429 Oxford Street
London W. 1, England
If material is not to be made available for inspection at your above address or at a point stated in your contract, please provide the Chief, Inspection Division, named above, with the necessary information so that the responsibility for inspection may be transferred. Notice to inspect should be in writing and ten days in advance of the desired inspection date so that inspection schedules may be prepared.
All communications or questions concerning inspection on this contract should be directed to the Chief, Inspection Division, or Inspection Divisions, named above, as responsible for the inspection of the material.
Your cooperation and assistance in supplying necessary information to permit the preparation of progress reports and the orderly maintenance of planned inspection schedules will be appreciated.

0. Partial Termination of Gontraot

8. Plaintiffs satisfactorily delivered all supplies called for by the contract except three items, namely, 2,000 revolvers, 500 cases of bullets, and 1,200 handcuffs. As described below, on January 17, 1957, defendant terminated plaintiffs’ “right to proceed” with delivery of the revolvers and handcuffs on the ground that plaintiffs had failed to make deliveries on or before January 15,1957. On February 13,1957, defendant terminated plaintiffs’ “right to proceed” with delivery of the bullets on the ground that plaintiffs had failed to make deliveries thereof on or before January 25,1957.
9. Under date of February 14, 1957, plaintiffs filed a formal appeal to the Administrator, GrSA, from the decisions of the contracting officer terminating plaintiffs’ right to proceed with deliveries of the revolvers and the handcuffs; *47 and under date of March. 1, 1957, plaintiffs appealed to said Administrator from the contracting officer’s decision terminating plaintiffs’ right to proceed with delivery of the bullets. On April 8, 9, 17, and 18,1957, hearings were held by the Board of Eeview of GSA with respect to plaintiffs’ appeal from the determinations by the contracting officer. The Board took evidence in the form of documentary exhibits and unsworn testimony. On December 18, 1957, the Board issued its recommendation to the Administrator that plaintiffs’ appeal should be denied. This recommendation was based upon a 209 page report consisting of a Statement of Facts comprised almost entirely of quotations from letters and other documents, a reproduction of the briefs of the parties, and an extensive statement of the reasons for the Board’s recommendation. On December 31, 1957, the Administrator approved the Board’s recommendation thereby denying plaintiffs’ appeal and upholding the contracting officer’s determinations. This suit followed, the petition being filed December 2,1959.
HI. THE REVOLVERS
10. Prior to entering into the present contract, plaintiffs had not engaged in the buying and selling of firearms. However, for a number of months before receiving the GSA letter of inquiry in the present case, Potter had engaged in discussions with a friend, Herbert E. Gotterson, regarding the feasibility of establishing a sporting firearms department in plaintiffs’ store. Potter considered Gotterson to be an expert in the field of small firearms, and his interest in bidding on the revolvers involved herein was stimulated by Gotterson’s suggestion that this might be a good way for plaintiffs to get started in the firearms business. From that time forward during the times material hereto, Gotterson actively assisted Potter in the handling of the bid and all contractual matters involving the revolvers, bullets and handcuffs. The employment arrangement between plaintiffs and Gotterson was not that of a full-time, bona fide employee working solely for plaintiffs but rather that of a part-time consultant working under an oral agreement for reimbursement of expenses incurred in behalf of plaintiffs *48 and a somewhat vague understanding that Gotterson would be paid on an hourly basis at some mutually agreeable rate. The record does not show that any such compensation would take the form of a fee or commission contingent upon plaintiffs receiving an award of the contract.
11. In formulating their bid, plaintiffs initially considered furnishing revolvers of American manufacture. They communicated with Smith & Wesson, Inc., which company was a competitive bidder, and ascertained that the price to plaintiffs would be about $35.80, each, for Smith & Wesson revolvers. Plaintiffs also communicated with Colt prior to July 26, 1956, but that company declined to provide plaintiffs with a price since it planned to quote directly to the Government.
As stated above, plaintiffs’ bid offered to furnish revolvers (hereinafter called the “Ruby Extra”) manufactured by Gabilondo, a Spanish manufacturer, for $33 each. They considered no other foreign or domestic arms manufacturer. Before offering the Ruby Extra revolvers, Potter discussed the matter with Gotterson, made inquiry of the Stoeger Arms Company in New York,[1] and spoke with a firearms expert in the New York City Police Department. On the basis of the information made available to him by these sources, Potter concluded that the revolvers manufactured by Gabilondo were well made and could be offered to the Government at an advantageous and attractive price.
12. Subsequent to the submission of their bid, plaintiffs transmitted to GS A a Gabilondo catalog describing the Ruby Extra. On August 8, 1956, GSA wrote plaintiffs acknowledging receipt of the catalog and stating:
*49 In order to properly evaluate this offer, we will require at least one and possibly two pistols for testing. Please furnish these samples as soon as possible.
Plaintiffs had already written Gabilondo on August 3 stating their interest, as suppliers to the U.S. Government, in purchasing 2,000 revolvers meeting stated specifications. The letter requested immediate price and delivery quotations and concluded:
‡ ‡
It is very important that we secure a sample revolver. We can arrange for you to deliver this sample revolver to our U.S. Consulate. Arrangements can then be made for inspection by our Government in Washington.
These revolvers will not be used in the U.S., but are being purchased here for use and delivery directly to the Far East for police use.
Plaintiffs did not receive an immediate reply to this letter, and on August 10 they wrote Gabilondo again requesting the desired information by a letter written in the Spanish language. Gabilondo responded by air mail letter dated August 22, 1956, acknowledging plaintiffs’ letters and stating:
$ ‡ $
We have to thank you very much indeed for your inquiry, but before going to go in further details we should be appreciated if you let us know the country of last destination of the guns in order to save any trouble could arise in those markets where we are exclusively represented. Other point is that actually we are very busy with large orders for pistols and revolvers, for some Police Departments, and we should be not able to give you a prompt delivery for the whole lot of 2.000 revolvers cal. 38 5" barrel.
$ ‡ ‡ $
13. Also, on August 22, 1956, plaintiffs wrote the United States Consul, Bilbao, Spain, requesting his aid in securing, at plaintiffs’ expense, two sample revolvers from Gabilondo and requested that he forward them via air diplomatic pouch to the Department of State for transmittal to GSA. On the following day, plaintiffs wrote GSA a letter reading, in pertinent part:
In compliance with the letter of 8 August 1956 from your Mr. Boss, we have contacted Mr. Bichard Hawkins, *50 Jr., our U.S. Consul in Bilbao, Spain, to procure two sample revolvers and send them via diplomatic pouch by air to Mr. Thompson, Spanish Area Desk, State Dept., Washington, D.C. We have already contacted Mr. Thompson to deliver these two samples directly to you.
We had previously instructed the Gabilondo factory to deliver these samples at our expense. The Spanish Embassy in Washington and the Spanish Consulate here in New York have already assured us that the samples will be made available.
We have recently had the opportunity of examining the identical Gabilondo revolver (but in a different caliber— .32 S&W long) and we find the material and workmanship to be of the highest quality and to compare favorably to the identical model in the Smith & Wesson line.
On the basis of this examination and since this .38 caliber is used by many governments throughout the world, we can guarantee that the Gabilondo .38 caliber Euby Extra XII as quoted will meet your bid requirements.
Since the time factor is extremely important on all items of this bid, we are prepared to make the following offer to enable you to make this bid award at this time. If (in the remote possibility) the Gabiondo [sic] Euby Extra revolver does not exactly meet all your bid specifications, we are prepared to supply the Smith & Wesson Military & Police .38 S. & W. Special 5" barrel (blue) at the same price quoted to you by the Smith & Wesson Company.[2]
Then, on August 27, 1956, plaintiffs cabled Gabilondo that “prompt delivery” [3] of the 2,000 revolvers was unnecessary but that delivery of the two sample revolvers was “urgent”. On the same day they wrote GSA confirming “our phone conversation of this afternoon” and stating:
* * * * *
It is logical to expect manufacturers of competing items to make claims for their own products and against competitors. As dealers, we are often in a position to evaluate the merits of competing articles.
*51 In this connection, we have studied the catalog references and field reports and we find that the Gobilondo [sic] products are equivalent to the Colt and the Smith & Wesson. The Gobilendo [sic] Euby Extra revolver is in world wide use and it has just come to our attention that the government of Thailand (which is near Vietnam) has just accepted a large shipment from the Gobilondo [sic] factory. We are also aware that the West German Police use the Gabilondo revolver.
Since your agency would normally accept a standard catalog reference and the general reputation as the basis of an award, we feel that the catalog reference already supplied, is sufficient to make the award.
To facilitate shipment of the balance of the order, we suggest that the award be made at this time.
We are aware that certain modifications may be made and that exact specifications will be forthcoming. We are, of course, agreeable to these changes. Therefore, if the complete award is made at this time, we would be in a position to negotiate with the U.S. arms companies to effect substantial savings to the government.
14. Upon the completion of the aforesaid contacts with Gabilondo and the U.S. Consul, Potter was of the opinion that the responsibility had shifted to the defendant for obtaining the revolvers from Gabilondo and sending them to the United States. However, on September 6,1956, the U.S. Consul wrote plaintiffs advising that the Consulate had contacted Gabilondo, and there were “several difficulties involved” in carrying out plaintiffs’ requests. The letter explained:
Ü* ‡ * *
The Spanish government controls very closely the production and sale both at home and abroad of firearms. Every shipment must be specifically authorized by serial number so that the sending of two samples requires nearly as much paper work as a shipment of 2,000. The company estimates that they need a minimum of one month to obtain an export permit from the appropriate Spanish ministry.
Gabilondo also explains that because of other prior commitments for the same type of pistol, they would need a minimum of from eight (8) to twelve (12) months to complete your order. If you were willing, however, they could supply the order in piece lots, but m any case, *52 the time element would remain the same for filling your requirements.
In the absence of instructions from the Department of State to the contrary, the Consulate is prohibited by regulations from accepting delivery of the sample pistols for shipment by diplomatic pouch. It is recommended that you instruct the company to ship them directly to you by open air freight thereby avoiding any unnecessary delays.
So far as the record discloses, plaintiffs chose not to follow the Consul’s recommendation.
15. On October 11, 1956, Gabilondo wrote plaintiffs as follows:
j|i # * % %
The price for our “rtjbt extra” revolver cal .38 special long Model XII, any length of barrel, with cleaning rod, descriptive booklet, in cartoon [sic] box, and sea packing included is $28. — FOB Spain.
In regard to delivery, we are not able to supply the 2.000 revolvers in less than 8 months after the order is firmily [sic] placed, and partial shipments must be allowed.
sfs V V
This statement by Gabilondo that it could not supply the revolvers short < 8 months after order-, and then only in partial shipments, did not unduly alarm Potter, even though his firm had contracted to deliver the revolvers within 60 days from October 3, 1956. On previous occasions he had been successful in persuading various manufacturers to better a stated delivery date, and he had no doubt that Gabilondo would deliver in less time than 8 months once a firm order had been placed. At this time he was more concerned with the matter of the sample revolvers and the comparative test required by the contract. He made numerous telephone inquiries of ICA and GSA as to whether the sample revolvers had been received since, upon receipt, he desired to arrange a meeting in Washington. It was his understanding from Gotterson that a representative of plaintiffs could attend the comparative testing of the Euby Extra and the Smith & Wesson.
16. The Consul’s suggestion on September 6, 1956, that delays were involved in obtaining even the sample revolvers *53 proved to be true. It was not until November 27,1956, that Gabilondo delivered two sample Ruby Extra revolvers to the American Consulate at Bilbao, Spain, and they did not reach the contracting officer until about December 8, 1956. Plaintiffs were not aware that the samples had been delivered to the Government until they received the contracting officer’s letter to them dated December 20, 1956, reading in its entirety as follows:
The preproduction samples of revolvers which you propose to furnish under “No Code, Item 1”, of subject contract have been tested by the H. P. White Laboratory, Bel Air, Maryland, under the provisions of the contract, as to equal in quality and performance to Smith & Wesson 38 Military and Police Model. Enclosed as Exhibit A is an extract from the test report from the H. P. White Laboratory. The test results indicates [sic] the “Ruby Extra” revolvers were not equal to the Smith & Wesson, in trigger pull, fine accuracy and several points as to general quality and workmanship. Therefore, this is to notify you that the “Ruby Extra” revolvers which you propose to furnish under the terms of the contract are not acceptable. Please furnish us the address to which the revolvers should be returned.
As you are aware deliveries of items covered by the contract are to be made by not later than December 3, 1956, which is within 60 days after date of execution. Inasmuch as the contract provides that if it is determined after the revolvers have been tested that they are not equal to Smith & Wesson 38 Police Model in quality and performance that the contractor will furnish Smith & Wesson at the same price, it is requested this type be furnished.
There is an urgent need for these revolvers, and the delivery is now delinquent by approximately 15 days, you are hereby notified that your failure to deliver or furnish evidence of shipment in accordance with the terms of the contract on or before January 15,1957 may result in termination of your right to proceed with delivery, and purchase may be made elsewhere, in which event any rights in the Government arising as a result of your default will be enforced.
17. Meanwhile, the 60 day delivery period under the contract had expired on December 3,1956, without the defendant taking any action to terminate the contract. The contracting officer elected to take no termination or default action pend *54 ing receipt of tlie sample revolvers and chose to await the outcome of the comparative tests. A few days after he had received the sample revolvers, the contracting officer employed the H. P. White Laboratory of Bel Air, Maryland, for the purpose of conducting a comparative test between the Euby Extra and Smith & Wesson revolvers.[4] This laboratory was founded in 1936, and its principal activity has been testing and research in the field of small firearms and ammunition. It has conducted firearms testing for the U.S. Army, Navy, and Air Force, the National Eifie Association, and several leading manufacturers of small firearms. Its representative who conducted the tests involved herein was its manager, Burton D. Munhall, and on December 11, 1956, he conferred with the contracting officer regarding the scope of the tests desired by GSA. Munhall has been employed by the White Laboratory since its inception in 1936 and became its manager in 1949. Since 1936, he has engaged personally in extensive testing of various types and makes of firearms, including pistols and revolvers, and he is an expert in such work.
18. At their December 11 conference, the contracting officer gave Munhall the two Euby Extra sample revolvers and instructed him to acquire an unused Smith & Wesson revolver for the comparison test. Munhall was told to perform tests as to primary load, accuracy, trigger pull, tolerances and fit, and endurance, and to prepare and send to the contracting officer his written report showing the test results and his conclusions. If at any time during the test procedures, Munhall concluded that the Euby Extra was not equal in quality and performance to the Smith & Wesson, he was authorized to discontinue further testing.[5] Munhall went to a wholesale gun supply company where he acquired a supply of .38 special cartridges with 158 grain bullets and a new Smith & Wesson .38 Military and Police Model revolver. The Euby Extra samples had 5-inch barrels, and he ordered the same length of barrel for the Smith & Wesson, but, since *55 the supply company did not have the 5-inch model, he accepted a Smith & Wesson with a 4-inch barrel.
Munhall then proceeded to the White Laboratory and commenced the comparative test on the afternoon of December 11, 1956.[6] He continued the test through December 12 on which day he prepared a written report of his findings and conclusions and sent it to the contracting officer. The pertinent parts of Munhall’s report read as follows:
GENERAL QUALITY:
This portion of the comparative evaluation cannot be reduced to numerical values. It is based solely on a visual examination of the exterior and interior of the Smith & Wesson and Ruby revolvers:

Rubv Extra Smith & Wesson

Smoothness of action Superior
Finish of parts Superior
Grip material Superior
Fit of parts Superior
Mechanical design Same except no no [sic] hammer block. Same except has positive hammer block.
The general quality of the Smith & Wesson Revolver is superior to the Ruby Extra Revolvers. The hammer block in the Smith & Wesson is an added safety feature.
TRIGGER PULL TEST!
A single action, trigger pull test was conducted, making five recordings on each gun by means of a Schrader spring-type, trigger pull tester with the following results:

Smith ós Ruby Extra Ruby Extra Wesson #524428 #524897

1_ 5H lbs. 8 lbs. 5K lbs.
2- 5 y2 8}i 5}i
3_ 5% 8}i 5%
4_ 5 8yi 6
5_ 5% 8 5%
Average_ 5. 35 8. 35 5. 65
A double action, trigger pull test was conducted making five recordings on each gun by means of a Chatillon Type 100 Spring Scale, Range 0-50 lbs., with the following results:
*56 Smith <6 Ruby Extra Ruby Extra Wesson MMW #mS97
1_ 12 lbs. 16 lbs 15 lbs.
2_ 12 16 15
3_ 11.5 15 14.5
4_ 11.5 15 14.5
5_-__ 11 16 16
Average_ 11. 6 15. 6 15
The trigger pull required in both single and double action firing of the Smith & Wesson Revolver is adequate for safe police use. The trigger pull requirements of the Ruby Extra Revolvers are excessive.
ACCURACY TEST:
A five-shot group was fired from each weapon at a range of twenty yards by each of four different shooters. In each instance the gun butt was rested on a sandbag for support. No shooter reported any noticeable difference in the ability to sight the three guns although the heavier, single action trigger pull did contribute to less accurate shooting with the Ruby Extra Revolvers. Each group was measured for size by measuring the distance between the widest holes in the targets. The approximate center of each group was determined and the vertical and horizontal deviation of this point from the point of aim was measured. The target results were as follows:
Ruby Extra, No. 624897 • Shooter Group size Deviation from point of aim Vertical Horizontal
A_ 7/" 4/"
B. 10/" 2"
C-2/" 7 K" 3/"
D. 3/s" 8/" 3"

Ruby Extra, No. 624488

A_ 2/s" 5/" 5"
B_ 3/" 7" 1 w
C_ 3 /" 6/"
D_ 4" 8" 3)4"

Smith & Wesson

Horizontal Deviation from mint of aim Shooter Group size

l/s" A____— 2/s"
1" B__.-...— 3J4"
0" C_ 2%"
K" D___ 5/"

*57
Target Averages:

Weapons Deviation from point of aim Group size Vertical Horizontal

Ruby #524397_ 3.28" 8.56" 3.12"
Ruby #524423_ 3.41" 8.62" 2.84"
Smith & Wesson __ 3.31" 1.81" .59"
While the group size fired from each gun was approximately the same size, the Smith & Wesson was superior in grouping the shots close to the point of aim. Both Ruby Extra Revolvers shot high and to the right, in all instances.
CONCLUSIONS :
The quality and performance of the Ruby Extra Revolvers submitted are not equal to that of the Smith & Wesson Military and Police Model Revolver with which they were compared on the basis of accuracy, trigger pull and workmanship.
It was not deemed necessary to make further comparative studies such as high pressure tests, endurance firing, mud and dust tests or other standard proofing procedures.
,19. In response to the contracting officer’s letter of December 20, 1956 (finding 16, supra), plaintiffs wrote GSA on December 24,1956, stating in part:
As you may know, we were not made aware that tests on the revolver samples were imminent. In fact, we were not advised that your office had received samples of revolvers, nor were we advised of the point of origin nor by what authority shipment had been made. Until this information is made available to us, we are not able to advise you as to the disposition of these samples.
We should like to have a full test report made available to us for study.
Tihis letter is, therefore, to notify you that we have fulfilled the conditions of the contract to the fullest extent on our part as per our agreement to date; and that we intend to complete final performance in accordance to our agreement.
Further, the letter agreed to a meeting of the interested parties in Washington on January 2, 1957. Gotterson attended the meeting on that date in behalf of plaintiffs and ivas shown the full text of the Munhall report and told that the Government expected delivery of Smith & Wesson revolvers instead of Ruby Extra revolvers. When he returned to New York City, he brought back with him the Ruby Extra sample re- *58 volvere. He and Potter examined the two revolvers and concluded that they were not in normal factory condition when tested by Munhall. Potter so advised the contracting officer on January 8, 1957, reiterating his contention that the Ruby Extra was, in fact, equal to or better than the Smith & Wesson. On January 18,1957, Potter wrote GSA objecting to the Munhall report and stating that plaintiffs intended “to abide by our contract and supply the ‘Ruby Extra’ within a reasonable time after we receive a copy of the test report.” In fact, on January 6, 1957, plaintiffs had cabled Gabilondo placing a “firm order” for 2,000 Ruby Extra revolvers. Potter again wrote GSA on January 20, 1957, stating, in part, as follows:
I am informed that the facts are that the revolvers as submitted to Mr. Munhull [sic] for testing were in the following condition:
1. The revolvers had not been adjusted to normal commercial standards.
2. The revolvers had been subjected to a chemical bath which removed all normal f actory oils and lubricants from the mechanism and left a residue rendering said mechanism in an adverse operating condition.
In fact this treatment was so severe, that in order to remove, the sideplate and screws, it required the use of a machine shop and the mutilation of the screw heads.
3. The wooden stocks were in a very poor condition caused by the bleaching action of the chemical bath.
4. Two parts were missing from each gun, namely — the safety positive hammer block and pin.
5. The barrel had been twisted out of alignment with the use of shop instruments such as a vise, etc., leaving tell tale marks. The barrel had also been twisted off the factory reference alignment mark, bending the factory permanent barrel alignment pin.
6. The front sight of the revolver was twisted from its normal aligned position in such a manner that the revolver would shoot high and to the right.
7. The main spring was out of proper factory adjustment causing additional difficulty with the trigger pull and the double action.
8. The ejector rod and the cylinder lock had been forced out of alignment causing a binding action on the *59 operation of the cylinder locking and release mechanism.
In view of the adverse operating conditions outlined above as tested by Mr. Munhull [sic], the fine showing of the Euby Extra revolver against the Smith & Wesson Military & Police model (in the S&W’s top operating condition) is in itself an indication of the remarkable and high qualitv of the Eubv Extra.
20. Meanwhile, the contracting officer on January 15,1957, had responded to a letter from plaintiffs dated January 8, 1957. The contracting officer stated in part:
Eeference is made to your letter of January 8, 1957 in which you request an extension of delivery on the revolvers Item 1, no code, and bullets Item 2, no code, covered by subject contract.
In view of our letter of December 20,1956 in which you were notified that the Euby Extra revolvers was [sic] not acceptable under the terms of the contract your request for an extension to deliver the Euby Extra revolvers is not understood. Under the terms of the contract you are now to furnish Smith & Wesson 38 Model instead of the “Euby Extra’.
Then, on January 17, 1957, the contracting officer wrote the following letter to plaintiffs:
Eeference is made to the above cited contract calling for delivery on or before December 3,1956 and my letter of December 20,1956 notified you that unless delivery was made on the below listed item on or before January 15, 1957 your right to proceed with delivery would be terminated.
In view of the urgent need for this item and your failure to make delivery as specified^ you are hereby notified that without prejudice to other rights which the Government may have as a result of your breach of contract provisions your right to proceed with any or all of the remaining deliveries of the following item is terminated:

Item No. 1, No Oode

Eevolver, “Euby Extra”, Model XII, Caliber 38,. 5" barrel, Mfg. by Gabilondo Campania of Spain.” [sic]
$ * * ‡ $
The purchase of revolvers meeting the specification will be made elsewhere and the difference in cost, if any, will be charged to your account.
*60 This letter was not received by plaintiffs until January 23, 1957. Despite their knowledge that the contracting officer had rejected the Euby Extra and had demanded the Smith & Wesson instead, the plaintiffs had placed a firm order with Gabilondo for 2,000 Euby Extra revolvers,[7] and proceeded with the procuring of a letter of credit to the order of Gabilondo. They took these steps because they did not believe the Munhall report had great meaning and because they felt they were required to proceed with procurement under that portion of the “disputes” clause in the contract reading:
Pending final decision of disputes hereunder, the contractor shall proceed diligently with performance of the contract and in accordance with the contracting officer’s decision.
21. Although Gotterson had examined the Munhall report at the January 2, 1957 meeting in Washington, Potter did not receive a copy of the report until near the end of February 1957. Based upon his experience with technical reports (Finding 2, supra), Potter concluded that the Munhall report was poorly done because, in his opinion, it was subjective and was not susceptible to duplication by another laboratory. As stated above, he also considered the test an unfair one because the sample Euby Extra revolvers were not in normal factory condition at the time of testing, whereas the Smith & Wesson was in such condition. (Finding 19, supra.)
On February 25, 1957, Potter placed an order with International Testing Laboratories, Inc. of Newark, New Jersey, for a research project to determine whether the Smith & Wesson revolver and the Euby Extra revolver were equal in quality and performance. Although International had not previously made any comparative tests of revolvers, it was a recognized testing and research laboratory which had performed services for GSA and numerous American *61 manufacturing concerns. By letter dated April 2,1957, International reported to plaintiffs:
In accordance with the instructions given to us, we have determined that the Ruby Extra is equal in quality and performance to the Smith & Wesson as evidenced by the precision of the trigger pull, workmanship, weight, finish of parts, quality of material, mechanical function and design.
This letter was sent by plaintiffs to the contracting officer who responded that it constituted only an unsupported conclusion and that without a test report it could not be evaluated. Later, International furnished a written report to plaintiffs dated June 17, 1957.[8] The President of International, David N. Hoffman, testified that his laboratory conducted a series of comparative tests using a new Smith & Wesson revolver, a new Colt revolver, and one of the Ruby Extra revolvers (#524397) previously tested by White Laboratory. Upon receipt from plaintiffs of the Ruby Extra, he noted that it was “not in a good operating condition.” The front of the ribbed section of the frame sight plane did not align with the rear of the grooved rib on the rear of the barrel, the front sight was canted slightly to the left, the sideplate screws were mutilated, the cylinder lock housing was out of line, the tension on the ejection rod seemed to bind the cylinder rotation slightly, an unblued surface was apparent at the bottom of the barrel where it was supposed to match the frame surface, and the safety hammer block and pin as illustrated in the Gabilondo instruction booklet were missing. International took no action to correct these defects nor did it conduct any firing tests. According to its report, International conducted a series of unspecified chemical, physical, and metallurgical tests on the three revolvers.[9] *62 Upon, completion of these tests, International compared the revolvers as to whether each of them could meet the claims contained in an advertising brochure issued by Smith & Wesson, Inc. on its .38 Military and Police revolver and entitled “Fourteen Famous Features.” This advertising material contained such meaningless phrases as “always tight, always safe,” “smooth performance always,” “perfect alignment,” “perfect ignition,” “super speed in double action shooting,” “lightning-fast” and the like. Nevertheless, International purported to find that both the Buby Extra and the Smith & Wesson revolvers (but not the Colt) met the advertising claims contained in the brochure with but one exception.[10] This comparison in terms of loose and generalized advertising claims rendered the International report subjective and not susceptible to scientific measurement.
22. The Munhall report was likewise subjective and not susceptible to scientific measurement. The report itself states as much in its comparison of the two revolvers as to “General Quality.” (See finding 18, supra.) In addition, the trigger pull and accuracy tests were performed under conditions susceptible to human error. The trigger pull tests were performed by means of hand-operated spring-type scales, and the accuracy tests were performed by four shooters of unequal ability firing the revolvers at paper targets. Munhall recognized the element of human error involved and endeavored to minimize it by computing averages from a number of the same tests.
23. Insofar as this record discloses, no comparative test was ever conducted by either party to determine whether a Euby Extra revolver in good operating condition was equal in quality and performance to a Smith & Wesson revolver in good operating condition.[11] The record is clear that the *63 sample Ruby Extra revolvers tested by both Muuhall and International were not in good operating condition, whereas the Smith & Wesson revolvers used for comparison were in such condition. The sights on the Ruby Extras were out of alignment causing them to shoot high and to the right, their excessive trigger pull needed adjustment, and the shaft-type safety hammer blocks were missing from both revolvers.[12] In the course of performing his tests, Munhall became aware of these defects. He knew how to correct them, and if he had done so, the results of his tests would have been different. He made no adjustments, however, because he had no instructions to change the guns in any way, and to correct the sight alignment might have required cutting away metal from the sights. Having found that “the Ruby Extra Revolvers submitted are not equal to * * * the Smith & Wesson * * * on the basis of accuracy, trigger pull and workmanship”, Munhall made no further tests. It would have been possible for Munhall to have made more comprehensive tests at additional cost, but he did not deem it necessary to do so under the instructions he had received from the contracting officer.
24. The specific Ruby Extra revolvers tested by Munhall clearly were not equal in quality and performance to the Smith & Wesson revolver tested by him for comparison. Plaintiffs were aware of this fact from the time of Gotter-son’s return to New York City following the January 2,1957 meeting which he attended in Washington. (See finding 19, supra.) It does not appear that plaintiffs made any effort to correct the known deficiencies in the sample re *64 volvers, nor did they endeavor to obtain another sample direct from Gabilondo in good operating condition for submission to the contracting officer.[13]
25. As stated in finding 20, supra, on January 17, 1957, the contracting officer wrote plaintiffs a letter terminating their “right to proceed” with deliveries of the Euby Extra revolvers. In that letter he also referred to “the urgent need for this item” and that revolvers meeting the specification would be purchased elsewhere with the difference in cost being charged to plaintiffs. However, it was not until February 21, 1957, that invitations to bid were sent by GSA to 17 prospective bidders, not including plaintiffs. On April 29, 1957, an award for the 2,000 revolvers was made to Smith & Wesson, Inc. in the amount of $68,200 with delivery to take place within 45 days thereafter. Delivery did not take place, however, until July 16,1957.
Under date of May 16, 1957, the contracting officer had written plaintiffs as follows:
Deference is made to your letter of May 13,1957 requesting that we inspect and accept revolvers, bullets, and handcuffs which were covered by subject contract, also that we terminate any other agreement for the purchase of any of the items under the same requisition.
Your right to proceed with deliveries of these items under subject contract has been officially terminated in writing and you have appealed this decision of the Contracting Officer to the Board of Eeview, GSA. Purchase of the items has been made elsewhere. Consequently, there is no further action necessary on the part of the Contracting Officer at this time.
On June 14,1957, plaintiffs wrote to Quality Control Division, GSA, New York, stating that the Gabilondo revolvers were ready for inspection, and on June 19, 1957, they wrote again to the same office requesting inspection. The Acting Chief of the Division replied that, since termination had occurred, no action could be taken by that Division and all further correspondence should be directed to the contracting officer.
*65 On June 21, 1957, Gabilondo wrote GSA Field Office in London, England, stating in pertinent part:
* * * we liave ready for inmediate [sic] shipment the first lot of 1.000 only “kubt extra” revolvers cal. 38 special long 5" barrel, which must be consigned to International Cooperation Administration, c/o U.S. Embassy, Saigon, Vietnam.
As the letter of credit states that payment of our bill will be made against presentation of the Notice of Inspection GSA form 308 in duplicate and properly executed by a General Services Administration, we are ashing you to let us know how this can be made or whether there is at Bilbao any Inpector [sic] for this purpose.
On July 19, 1957, the Director of National Buying Division, GSA, replied to a letter which plaintiffs had again directed to Quality Control Division, GSA, New York,, on June 21, 1957, inquiring about inspection on undelivered items. The Director referred to the previous termination action and the pending appeal to the GSA Administrator, and concluded:
In view of the fact that your contract has been terminated, no further steps will be taken by our inspection officials in New York or elsewhere as to items undelivered at the date of contract termination. Also, such administrative remedies as you have are being pursued by you through the Board of Beview proceedings.
Therefore, if any administrative relief is to be granted, it will _ be accorded through the Board of Beview proceedings.
As stated above (Finding 9, supra), on December 31,1957, the Administrator approved the recommendation of the Board of Beview and upheld the contracting officer’s determinations.
26. Plaintiffs have never canceled or recalled their revolver order to Gabilondo.[14] Plaintiffs have not been sued by Gabilondo, nor has that company made any formal claim against them. During September 1960, Potter conferred in *66 New York with a Mr. Heedles, who was Gabilondo’s representative in Mexico. Potter asked Heedles to ascertain whether Gabilondo still had the 2,000 revolvers which plaintiffs had ordered. On September 27,1960, plaintiff received a telegram from Gabilondo reading “Corresponding inquiry Heedles wish to inform you I have in stock merchandise your order.”
IV. THE BtTLLETS
27. The letter of inquiry referred to in finding 3, above, contained a page entitled “Purchase Requirements and Provisions.” After providing that the materials to be furnished could be supplied from any country in the world (with immaterial exceptions), the letter further provided that the point of origin of a shipment must be stated in the bid quotation and that terms of delivery were as follows:
(a) Products manufactured in and shipped from U.S.A.
* * * * *
(2) PAS Vessel U.S. port of exit (bidder to state port or give Government Option of ports named).
(b) Products manufactured in and shipped from source countries other than U.S.A.
(1) F.O.B. vessel at port of exit (bidder to state port).
As stated in finding 4, above, plaintiffs bid a total price of $47,630 on the bullets, as specified. The only area sources of materials specified by plaintiffs in their bid were Spain, Japan, Switzerland, and the United States. In specifying which items would originate in foreign countries, plaintiffs did not mention item 15 dealing with bullets. The contract, as ultimately executed, provided that the inspection point for the revolvers would be Elgoibar, Spain; for certain typewriter equipment, Yverdon, Switzerland; and for certain cameras and optical supplies, Tokyo, Japan; and that the inspection point for all other items would be the “Contractor’s Plant, New York, N. Y.” As to delivery points, the contract provided “FOB Vessel, Port of Shipment, Balboa, [sic] Spain” for the revolvers; “FOB Vessel, Port of Shipment, LeHarve, [sic] France” for the typewriters; “FOB Vessel, Port of Shipment, Tokyo, Japan,” for the cameras and *67 optical supplies; and “FAS Vessel, Port of Shipment, New York — All American Items.” No provision was made in the contract for delivery points on any items of foreign manufacture other than the revolvers, typewriters, cameras and certain optical supplies.
28. In October 19’56, Potter made inquiries of two domestic ammunition manufacturers to ascertain the terms on which they would supply bullets meeting the contract specifications. Potter was informed that the bullets specified had been discontinued as a stock item by American producers and were not available for delivery from existing inventories. One company declined to undertake manufacture, and the other specified a long delivery period. On October 22,1956, plaintiffs asked GSA to consider the acceptability of an alternate type .38 caliber bullet of 130 grain, but on October 29, 1956, the contracting officer rejected the request and advised plaintiffs that they must furnish the 158 grain bullet as specified in the contract.
29. Plaintiffs had previously addressed an inquiry concerning these bullets to an ammunition manufacturer in Milano, Italy, known as Leon Beaux & Co. That company had written plaintiffs on October 22, 1956, stating a tentative price of $31.51 per thousand bullets and an anticipated delivery date of four months. Plaintiff responded by letter dated October 31, asking for “your very lowest price and use the following words exactly in your quotation: bullet, lead, 158 GR. 38 SPECIAL MATCH, 2,000 PER CASE, 500 CASES, PRICE p.o.b. vessel GENOA.” Also, on November 6, they forwarded to Leon Beaux four sample bullets. On November 22, Leon Beaux quoted plaintiffs by cable an FOB price of $38 per thousand. The contract delivery date of December 3, 1956, expired without any termination action being taken by the contracting officer.
30. At the meeting between Gotterson, the contracting officer, and others held in Washington on January 2,1957 (see finding 19, supra), the contracting officer told Gotterson that delivery of the three items in dispute was delinquent and that GSA expected delivery of all three items “immediately, or within a reasonable length of time.” He stated no actual date for delivery but did advise Gotterson that GSA expected *68 delivery of tbe bullets and handcuffs to be in New York. On January 8,1957, plaintiffs requested tlie contracting officer to change the bullet provision of the contract to read as follows:
* * * “Bullet, lead, 158 gr. 88 special match, 2,000 per case.” Complete shipment shortest time possible before July 1957.
Then, on January 10, 1957, plaintiffs placed an order with Leon Beaux for bullets, as specified in the contract, at a price of $38 per thousand, FOB Vessel Genoa, Italy. They stated that delivery was desired June 1,1957, or sooner and that inspection would be made by a GSA inspector at the Leon Beaux factory. On the same day, January 10, they wrote the GSA Field Office in London, England, as follows:
According to the instructions given to us by Mr. O. W. Teekemeyer, Director, Inspection Division, GSA, you are hereby notified that item: No Code #2 (bullets, etc.) are to be inspected at the location shown below:
Leon Beaux & Co. (S.P.A.)
Via Dante 14
Milano, Italy
For your information, please be advised that this transaction has been made known to our Embassy in Italy and to the Italian Government.
Contract terms are FOB vessel Port of exit, Genoa, Italy.
A copy of the aforesaid letter was sent to “Inspection Division, GSA, New York City.”
By the words “instructions given to us by Mr. O. W. Tecke-meyer,” plaintiffs intended to refer to the second paragraph of Teckemeyer’s form letter to plaintiffs dated October 17, 1956, the body of which is set forth in finding 7, sufra. They interpreted the language of that paragraph as constituting their authority to change the inspection points simply by a written notice to the appropriate Inspection Divisions at least ten days in advance of the desired inspection date.[15]
*69 The London Field Office wired the National Buying Division, GSA, on January 18,1957, asking confirmation that the bullets were to be supplied from Italy. GSA responded by wire dated January 24,1957, stating:
Bullets, Item 2, No Code, are to be inspected at contractor’s plant New York City as provided in contract.
On January 23, 1957, the contracting officer had written plaintiffs to the same effect. Plaintiffs replied on J anuary 26, 1957, stating they were aware of the contract provision that bullets were “to be inspected at contractor’s plant New York City” but they referred the contracting officer to their “instructions” from Teckemeyer and concluded:
These instructions have been followed. Therefore, if there is any reason why these instructions cannot be followed by your office to permit inspection in Italy, we should have been advised some time ago.
Therefore, please advise your London office accordingly.
Meanwhile, on January 15,1957, the contracting officer had written a letter to plaintiffs in which he denied plaintiffs’ request of January 8,1957, supra, and stated:
* * * you are hereby notified that your failure to deliver or furnish evidence of shipment in accordance with the terms of the contract on or before J anuary 25, 1957 for item 2, no code, bullets, lead 158 gr. 38 special match may result in termination of your right to proceed with delivery, and purchase may be made elsewhere, in which event any rights in the Government arising as a result of your default will be enforced.
31. Having placed an order with Leon Beaux for the bullets, plaintiffs negotiated with their local bank for the issuance of a letter of credit covering the purchase price. On January 25, 1957, such letter of credit was issued to Leon Beaux in the sum of $38,000 subject, inter alia, to GSA inspection.
32. On February 13, 1957, the contracting officer terminated plaintiffs’ right to proceed with deliveries of the bullets by the following letter:
Reference is made to our letter of January 25, 1957 in which you were notified that unless delivery was made of Item No. 2 no code, bullet, lead, 158 gr. 38 special *70 match, 2,000 per case, 500 cases on or before January 25, 1957, your right to proceed with delivery would be terminated.
Our Inspection Division files do not reflect you have asked for inspection of this item at your plant in New York City as provided for by the Contract. The letter from the Director, Inspection Division which you quote was not intended to modify the terms and conditions of the contract by changing the inspection point without the express consent of the Contracting Officer, who is the only person authorized to amend or change the contract. There is no advantage to the Government to be gained by changing the inspection point on the bullets from the contractor’s plant in New York to Italy. In fact, the inspection cost would be greater. Therefore, the change is not contemplated.
Since we do not have any evidence of delivery or intention of delivery as specified by the contract, you are hereby notified that without prejudice to other rights which the Government may have as a result of your breach of contract provision, your right to proceed with any or all of the remaining deliveries of the above item is terminated.
The purchase of bullets meeting the specification will be made elsewhere and the difference in cost, if any, will be charged to your account.
The contracting officer testified at the trial that the aforesaid termination arose solely from non-delivery and had nothing whatsoever to do with the quality of the bullets. By at least January 18, 1957, he was aware that plaintiffs were asking for inspection in Italy, but he remained of the firm opinion that, under the terms of the contract, the only permissible place of inspection was New Yoi'k.
S3. On February 21, 1957, the contracting officer solicited bids for the bullets from 17 suppliers, not including plaintiffs. A contract for the bullets was awarded on April 22, 1957 to American Munitions Company for a total price of $49,100. Delivery took place on July 26,1957.
34. On several occasions after the termination letter of February 13,1957, plaintiffs requested inspection of the bullets by GSA. In each instance, GSA responded that due to termination by the contracting officer, no further action would be taken by GSA. On December 31, 1957, the Ad *71 ministrator, GSA, approved the recommendation of the Board of Beview, affirmed the action of the contracting officer, and denied plaintiffs’ appeal. On May 21, 1960, the Consulate General of Italy in New York advised plaintiffs that Leon Beaux intended to institute suit against them in the Italian courts and forwarded to them by certified mail a legal document written in the Italian language and entitled “Deed of Intimation.” From the English translation accompanying this document, it appears to have issued out of Milan Superior Court, Milan, Italy, and further that Leon Beaux asserts a contract with plaintiffs for the purchase of one million .38 caliber cartridges, that plaintiffs have taken delivery and paid for only 700,000 cartridges, that there remain 300,000 cartridges undelivered for which plaintiffs are responsible, together with certain additional charges, and the document concludes, in pertinent part, as follows:
NOW
they serve by these presents an
INTIMATION
On potter’s, with registered offices at 708, Flatbush Avenue, Brooklin [sic] 25, New York, U.S.A., to provide, within thirty days on receipt of this intimation, to take delivery of the residual three hundred thousand cartridges relating to the order placed on the 10th January, 1957, up to now on storage on their own account at leon beaux & co.’s own cost, for the amount of 11.400. — $, besides the payment of 11.490,50 $ for further charges such as interests, custody, insurances, stowage, etc., as per the list enclosed with the registered letter dated October, 14th, 1959, which the intimating leon beaux & co. had forwarded to potter’s, who have already acknowledged receipt thereof, and advising that, in case of default of payment, they will bring an action against potter’s, in order to let them condemn to pay the goods in question besides all further charges as well as costs in action and common law.
The record does not indicate whether Leon Beaux & Co. carried out its threat to sue plaintiffs as indicated.
V. THE HANDCUEES
35. With respect to the remaining item in dispute, the contract description reads as follows:
*72 Handcuffs, equal to Peerless, same as used by New York City Police Dept. Self-locking, approx. 10 oz. nickel finish.
The facts regarding plaintiffs’ bid, as amended, the contract, the inspection and the delivery procedures have heretofore been related in findings 3,4, 5, 6, and 7, and need not be repeated here. Also, the dispute regarding the handcuffs is similar to that regarding the bullets as to the proper place of inspection. In this respect, facts common to both items are found in findings 27 and 30, supra.
36. As in the case of the bullets, the contract contains no specific provision referring to the place of inspection for the handcuffs by name. However, unlike the case of the bullets, GSA was aware from the time of plaintiffs’ amendment to their bid dated July 25, 1956, that plaintiffs intended to furnish handcuffs originating in a foreign country and that the price quotation was FOB Vessel, port of exit of the foreign country named. However, unlike the case of the revolvers (and certain other items not involved), plaintiffs did not name the foreign country from which the handcuffs would originate, and the contract as executed made no reference thereto.
37. On September 28, 1956, plaintiffs requested a quotation for 1,200 pairs of handcuffs from B. Echeverria, S.A., Eibar, Spain, a manufacturer of handcuffs under the name of “Star.” They wrote again on October 18, 1956. On October 23, Echeverria replied and requested that plaintiffs furnish shipment information. Plaintiffs replied on October 29 and provided such information which consisted of their assurance that the handcuffs would be shipped directly from Bilbao, Spain to Saigon, Vietnam. On November 6, Echeverria provided plaintiffs with its prices by letter reading in part:
We received your above letter and cabled you today as follows:
ROB PRICES HANDCUFFS WITH ROUND KEYS 2,52 DOLLAR FLAT KEYS 2,74 DOLLARS”.
As you will note, we can supply our “Star” Handcuffs with round or flat keys and when placing your order, please state one or the other type of keys.
As stated, the above mentioned prices are for goods packed in strong seacases free Spanish port of Bilboa *73 [sic]. We could ship the order from Bilbao to Saigon with transhipment at any North European port, say Hamburg or Bremen.
$ $ $ $ $
Supply could be made 500 pairs per month, but if you place the order within this month we probably could ship all the 1,200 pairs at one time.
On November 29, 1956, plaintiffs cabled an order to Echeverría and confirmed it by letter dated December 7,1956, reading in part as follows:
This will confirm our order sent to you by cable 29 Nov. 1956.
The order is as follows:
1,200 pair handcuffs $2.52 each total $3,024.00
An irrevocable letter of credit has been opened in your favor for the full amount of $3,024.00 through the BANCO de vizcaya, bilbao, SPAIN. Letter of credit number 78262.
If possible, the name MAC is to be stamped on each pair of handcuffs.
Price is to include export packing (wood cases) and delivery FOB vessel Bilbao, Spain.
Inspection will be by:
MANAGER, LONDON YIELD OEFICE
DEEENSE MATERIELS SERVICE
GENERAL SERVICES ADMINISTRATION
KEVSIGN HOUSE 429 OXPORD STREET
LONDON W 1 ENGLAND
*****
Also, on November 29, 1956, plaintiffs had cabled the London Field Office of GSA, advising that the handcuffs were “now available for inspection and delivery at Bonufacio Echeverría Eibar, Spain.” [16] On November 30, 1956, the London Field Office acknowledged receipt of the cable and requested information from plaintiffs concerning the identity and location of the Spanish manufacturer. The requested information was transmitted to the London Field Office (copy to GSA, New York) by plaintiffs on December 3,1956.
*74 38. Meanwhile, under date of November 14, 1956, plaintiffs had written the contracting officer regarding the handcuffs as follows:
1. Code: 680-2 Handcuffs; Please refer to our original contract. You will note that contract calls for: “Handcuffs, equal to Peerless, same as used by New York City Police Department. Self-locking, approximately 10 oz., nickel finish.” For your records we are enclosing a certification that the handcuffs we plan to supply will meet these specifications. * * * This certification will protect the Governments [sic] interests. However, we are sending a sample of the handcuffs as you requested. Should you feel that it would be in the best interests of the Government to change the contract specifications, we would be happy to cooperate with you.
*****
As of this time the contracting officer was unaware that plaintiffs had been negotiating with a manufacturer in Spain for the purchase, inspection and delivery of handcuffs in Spain. However, shortly thereafter, he became aware of plaintiffs’ negotiations with Echeverría by reason of their letter to him of November 17,1956.
39. Under date of December 6,1956, the contracting officer wrote plaintiffs as follows:
The preproduction sample of handcuffs which you groposed to furnish under Code 680, Item 2, Contract S-00P-22465-ICA have been thoroughly examined and tested as to quality and acceptability under the provision of the contract, that is, “equal to Peerless.” Enclosed as Exhibit A is an extract showing the results of the test conducted. It can be readily seen from the test results the sample handcuff furnished for test purpose does not meet the requirements of the contract and is, therefore, not acceptable.
As you are aware deliveries of items covered by the contract are to be made within 60 calendar days after date of execution, which is December 3, 1956. Further the contract indicates that the handcuffs are to be inspected at your plant in New York City. Inasmuch as we have not as yet received notice handcuffs are available for inspection at your New York plant, it is requested that acceptable items be made available without further delay.
*75 Attached to the letter was an itemized schedule of test comparisons made by GSA Quality Control Division between the Star handcuff sample submitted by plaintiffs and a Peerless handcuff. This test purported to find that the Star handcuff was an inferior product to the Peerless handcuff. However, detailed findings in this regard are not deemed necessary because, at the trial, the contracting officer testified that he had not terminated the contract with respect to handcuffs for the reasons contained in the test report on the sample. He terminated the contract for failure of the contractor to make delivery.[17]
40. Under date of December 20, 1956, the contracting officer wrote plaintiffs as follows:
Further reference is made to my letter of December 6, 1956 in which I notified you that the preproduction samples of handcuffs submitted for test purposes did not meet the requirements of the contract and are not acceptable.
Your letter of December 10, 1956 takes issue with our finding inasmuch as you state the handcuffs you propose to deliver are in fact equal to Peerless. You do not, however? support your position with laboratory or other tests which must be conducted to determine the quality of the material. In my discussion with Mr. Gotterson on this matter, I suggested that you have the handcuffs tested by a reliable testing laboratory for your own information to ascertain whether or not they were equal to “Peerless.” Apparently, you did not deem this advisable.
The time of delivery including any extension thereof, on the above cited contract expired December 3, 1956. The records in this office indicate that neither the merchandise or evidence of shipment has been received on Item 2, Code 680, handcuffs. Since there is an urgent *76 need for this item, you are hereby notified that your failure to deliver or to furnish evidence of shipment on or before January 15, 1957 may result in termination of your right to proceed with the delivery, and purchase may be made elsewhere, in which event any rights in the Government arising as a result of your default will be enforced.
On J anuary 2,1957, at the meeting in Washington between Gotterson, the contracting officer, and others, the contracting officer told Gotterson that inspection and delivery of the handcuffs contracted for were expected by the Government to be made in accordance with what he considered to be the contract terms, namely, inspection at plaintiffs’ place of business, and delivery F.A.S. Vessel at the Port of New York.
However, as in the case of the bullets, plaintiffs remained of the opinion that the Teckemeyer letter authorized them to change the inspection point by a written notification to defendant ten days in advance of inspection. (See finding BO, supra.) On January 17, 1957, they wrote the London Field Office stating their understanding that Echeverría would have the handcuffs available for final inspection at the beginning of J anuary 1957. They stated further:
If there is any reason why final inspection cannot be made before 31 January 1957, we should be advised so that we may extend our letter of credit for an additional length of time.
However, in response to an inspection inquiry by plaintiffs several days earlier, the London Field Office advised plaintiffs by letter of J anuary 17, 1957, that its files showed the Spanish handcuffs had been tested and found unacceptable. On January 21,1957, plaintiffs advised the contracting officer of the information they had received from London and stated that, if it were true, then the full responsibility for withholding delivery rested with the contracting officer. They recommended that he cable London his permission to inspect the handcuffs in Spain.
41. On J anuary 17,1957, by special delivery, the contracting officer wrote plaintiffs as follows:
Eeference is made to the above cited contract calling for delivery on or before December 3,1956 and my letter of December 20, 1956 notified you that unless delivery *77 was made on tbe below listed item on or before January 15, 1957 your right to proceed with delivery would be terminated.
In view of the urgent need for this item and your failure to make delivery as specified, you are hereby notified that without prejudice to other rights which the Government may have as a result of your breach of contract provisions your right to proceed with any or all of the remaining deliveries of the following item is terminated:

Item No. Code 680

Handcuffs, equal to Peerless, same as used by New York City Police Dept. Self-locking, approx. 10 oz. nickel finish.
The purchase of handcuffs meeting the specification will be made elsewhere and the difference in cost, if any, will be charged to your account.
Under date of January 23, 1957, plaintiffs acknowledged receipt that day of the contracting officer’s letter of January 17, 1957. They disputed defendant’s right to terminate the contract for the handcuffs, and to make purchase elsewhere.
42. On February 21, 1957, the contracting officer sent out invitations for bids on the handcuffs[18] to 17 suppliers, not including plaintiffs. Bids were received on or about March 15, 1957, and on April 29,1957, an award for the handcuffs was made to Peerless Handcuff Company for a total price of $8,040. The handcuffs were inspected at the Peerless plant in three lots on June 3,1957, June 19,1957, and July 2,1957. Deliveries to U.S. ports were made in three lots of 400 pairs each on June 10, 1957, June 20, 1957, and July 2, 1957.
43. Following a conference in Washington on March 29, 1957, between Gotterson and the contracting officer, the plaintiffs wrote the latter on March 30 stating that the 1,200 handcuffs were available for inspection and delivery in Spain and that it was to the best interests of the Government to have delivery in Spain because of the freight savings involved. The contracting officer responded on April 2, 1957, stating, in pertinent part:
The handcuffs were not made available as specified under the contract. Your right to proceed with deliveries has *78 now been terminated. Yon have appealed this decision of the contracting officer, and the case is scheduled for a hearing before the Board of Beview, April 8, 1957. Your request to change the inspection point does not now appear advantageous to the Government, therefore, it is not acceptable.
44. In response to an inquiry by plaintiffs on June 21, 1957, as to whether the New York Begional Office of GSA would undertake inspection of the undelivered items under the contract, the Director of the National Buying Division, GSA, responded in the negative on July 19,1957. He stated that due to the termination by the contracting officer and the pendency of plaintiffs’ appeal therefrom to the Administrator, no further steps would be taken by GSA inspection officials in New York or elsewhere.
45. On December 31, 1957, the Administrator, GSA, approved the recommendation of the Board of Beview and denied plaintiffs’ appeal from the actions of the contracting officer.
VI. DAMAGES
46. Plaintiffs claim damages from defendant’s alleged breach of contract totalling $183,499.92. Of this amount $47,651.42 is allegedly composed of counsel fees ($6,106.62), accounting fees ($725), long distance telephone and travel expense ($9,475.64), transcript cost ($264.16), International Testing Laboratories testing fee ($600), and value of time devoted to claim by Potter and Gottei’son ($30,500). The foregoing expenditures totalling $47,651.42 were claimed by Potter to have been incurred subsequent to the contract terminations described above and to relate solely to the preparation and presentation of plaintiffs’ claims against defendant before GSA. With the exception of a portion of the counsel fees amounting to $2,500, transcript cost of $264.16, and laboratory fees of $500, the record does not satisfactorily establish either the reasonableness of the aforesaid expenses or their direct and exclusive relationship to the contract termination appeals here involved.
Plaintiffs also claim the sum of $11,490.50 as the amount claimed against them by Leon Beaux for additional costs allegedly incurred by that company in storing, insuring, and *79 otherwise holding the bullets for plaintiffs’ account. The only proof in the record regarding this claim is a unilaterial assertion by Leon Beaux in March 1960 that they intended to sue plaintiffs for this amount in addition to an unpaid purchase price for 300,000 bullets. (See finding 34, supra.)
The balance of plaintiffs’ claim aggregating $124,358 has been computed by them using either of two methods, as follows:

Method No. 1

Total Contract Price_$174, 435. 87
Less: Amounts Paid by Defendant_ 50, 077. 87
Balance Claimed_$124,358. 00
Method No. 2
Total Contract Price for Revolvers, Bullets, and Handcuffs Less 7 percent discount_$109, 860. 90
Net Amount Withheld by Defendant for Excess Repurchase Cost___ 14,497.10
Total Claimed_$124, 358. 00
The defendant concedes the correctness of the above figures but not the validity of the claim.
47. In the event the court should determine that plaintiffs are entitled to recover for loss of anticipated profits on the three supply items involved herein, such loss may be computed from the record as follows:
Contract Supplier's price price[19]
Revolvers- $66, 000 $56,000 (Gabilondo)
Bullets- 47,630 38,000 (L. Beaux)
Handcuffs- 4,500 3,024 (Echeverría)
$118,130 $97,024
The difference between $118,130 and $97,024 is $21,106, and the latter amount fairly represents plaintiffs’ loss of anticipated profits herein.
*80 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and the petition is dismissed.

 The Stoeger catalog called “The Shooter’s Bible” contains a section devoted to Gabilondo products. It describes the Ruby Extra, as follows :
“EUBY EXTEA EEVOLVEE
“In March of 1929 Gabilondo patented a revolver under this trademark and continued to manufacture this gun until the start of the Spanish Civil war in 1936. Production of this gun was resumed in 1949 and at present Gabilondo is the sole manufacturer of revolvers in all Spain.
“In recent years many governments and municipal authorities have been supplied with Llama pistols and Ruby revolvers. Amongst these are: Germany, Cuba, Siam, Chile, Bolivia, Nicaragua, Ecuador, Portugal, Philippines, Guatemala, Mexico, Spain, England.
“At the present time the Ruby Revolver is not sold in the united States because of ite high cost”

 On August 28 195,6, plaintiffs -wired GSA that the “overall discount applies if we supply Smith and Wesson revolver.”

 Potter testified that his use of the words “prompt delivery 2,000 unnecessary” reflected his belief at the time that, since the contract had not yet been awarded and since plaintiffs’ bid contemplated 120 days for deUvery, there would probably be sufficient time for delivery. • In using the words above quoted, he was thinking in terms of a 30 .to 45 day delivery being unnecessary.

 The selection of this laboratory was determined upon in a joint conference between the contracting officer and representatives from ICA and GSA Quality Control Division.

 These oral instructions were later reduced to writing by a GSA Purchase Order, dated December 17, 1®55, in the amount of $1i61.62.

 In his written report at two places, Munhall referred to this date as 11 November 1956. This was an Inadvertent typographical error.

 Sometime in January 1957, Potter Rad asked Smith & Wesson’s New York representative to confirm an earlier quotation on the Smith & Wesson revolver. In response Potter received a letter from the representative under date of January 18, 195.7, quoting the Smith & Wesson revolver at “$35.80 each packed for export PAS New York.”

 By this date the administrative hearings before the GSA Board of Review had been concluded. However, on June 26, 195.7, prior to the time that the Board’s report and recommendation were filed, plaintiffs’ attorney forwarded a copy of International’s report to the Board.

 Hoffman testified at the trial that these tests consisted of the Rockwell Hardness Test, visual examination, study of advertising literature, spring tension and trigger pull tests on a Dillon Testing Machine, microscopic examinations of metal sections, and photographic and optical tests. He could not recall the results of these tests except in a very general way, but stated that such results would be contained in the laboratory’s work papers which he did not have with him.

 International concluded that none of the revolvers were made of what the advertisement called “the very finest shock resistant steel obtainable.”

 Mr. C. R. Hellstr.oin,, President of Smith & Wesson, Inc., and himself an expert in small fireanmsj, testified that he had participated in two tests conducted at the Smith & Wesson factory for the purpose of comparing the Ruby Extra and the Smith & Wesson. However, these tests did not purport to be full and complete, since they were performed to determine only ballistic and metallurgical characteristics. Nonetheless, they wene suflicient to convince Mr. Hellstrom of the superiority of his company’s revolver over the Ruby Extra. Por a number of years he had held the opinion that the Ruby Extra was an inferior copy of the Smith & Wesson, andl to him the tests were confirmatory of his opinion. As to the Gabilondo Company, he stated that Smith & Wesson had never really “felt their competition.”

 However, Gabilondo’s advertising material shows this hammer block as standard equipment on the Ruby Extra. MunhaU observed' that the side-plates of the Ruby Extras contained the appropriate groove and fittings for a hammer block similar to that of the Smith & Wesson, which fact caused him to examine the container boxes for the missing hammer blocks but without success. International had found that a Smith & Wesson hammer block would fit into the Ruby Extra satisfactorily; Munhall did not test for such interchangeability.
Mr. Hellstrom (see footnote 11, supra) was the inventor of the shaft-type safety hammer block contained in the Smith & Wesson revolver. It is an important safety device which prevents an accidental firing of the gun through an unwanted blow on the hammer, such as might occur if the gun were dropped. He and a J. W. Norman obtained a united States patent on this device under date of May 17, 1949, which they assigned to their employer, Smith & Wesson, Inc. Since 1949, when Gabilondo resumed production of the Ruby Extra, Hellstrom has believed that the hammer block design of the Ruby Extra has infringed the aforesaid patent. However, the patent is only registered in the United States, and Smith & Wesson has never instituted suit against Gabi-londo in Spain for patent infringement.

 As far back as September 6, 195;6, the U.S. Consul at Bilbao had recommended to plaintiffs that they avoid unnecessary delays by instructing Gabi-londo to ship the sample revolvers direct to plaintiffs by air freight. (See finding 14, supra.)

 On January 25* 1957, plaintiffs had obtained from a New York bank a letter of credit in favor of Gabilondo subject to GSA inspection and permitting partial shipments. After several extensions, the letter of credit was allowed to expire around the end of 1958. At that time, the bank returned to plaintiffs their collateral which had been pledged as security for any payments made under the letter of credit.

 Plaintiffs claim that their interpretation of the said second paragraph of the Teekemeyer form letter is bolstered by the fact that in March 1957, after the dispute had arisen herein, GSA revised its inspection form letter on FS — 166 so as to eliminate the paragraph in question. Furthermore, Potter had experienced no difficulty in obtaining a change of inspection point on another item in this contract from New York to Pittsburgh, Pennsylvania. He had accomplished this simply by a telephone call to the New York inspector assigned to the contract.

 Nothing has been found in the record to clarify the meaning of this cable. According to letters from Echeverría to plaintiffs, the handcuffs would not be available for inspection until the first part of January 1957.

 This position appears to have been taken consistently by tbe GSA administrative representatives. In its opinion herein, the Board of Review observed :
“The Federal Supply Service (GSA) representatives have stated that the appellant was never told that it could not deliver handcuffs as a result of the failure of the sample. Instead, the appellant was merely notified that the representative sample did not meet the specifications. This was only a warning that handcuffs identical with the sample would not be acceptable, if offered. They contended that the failure of the sample had no bearing on the termination of the contract. The appellant was informed that the Government was willing to accept handcuffs that did meet the requirements of the contract.
“In this respect, the evidence made available to the Board of Review supports the statements made by the representatives of the Federal Supply Service."'

 This invitation of February 21, 1957, contained the same specification for the handcuffs as that contained in the original invitation except that the words “1200 pull test” were eliminated.

 Plaintiffs have not paid any of these amounts. While preceding findings show that plaintiffs placed orders with the three suppliers, there is nothing in the record to show the actual amount of liability, if any, which plaintiffs may have thereunder.